## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Marguerite Elizabeth Crumbley,

               Plaintiff,

                          Case No. 1:19-cv-1666-MLB

v.

Kelvin King, et al.,

               Defendants.

_____/

## **OPINION & ORDER**

This case arises from a motor vehicle collision. Defendant Kelvin King crashed into Plaintiff Marguerite Elizabeth Crumbley while he was driving a truck for Defendant Western Internal Gas & Cylinders, Inc. ("Western"). This matter comes before the Court on two motions for leave to file matters under seal (Dkts. 98; 110), a motion to exclude expert testimony (Dkt. 101), and two motions for partial summary judgment (Dkts. 106; 108). The Court's rulings are below.

## I.   Background[1]

On the day of the accident, King was driving a truck while working for Western.  (Dkts. 106-28 ¶ 2; 112 ¶ 2; 108-7 ¶ 2; 114 ¶ 2; 112(A) ¶ 4; 116 ¶ 4.)  He arrived at work and logged in around 4:00 a.m., did a pre-trip inspection (which showed nothing wrong with the vehicle), and began driving east on I-20.  (Dkts. 106-28 ¶¶ 3, 5, 21; 112 ¶¶ 3, 5, 21.)  He was headed from Birmingham, Alabama to Goldsboro, North Carolina.  (Dkts. 108-7 ¶ 18; 114 ¶ 18.)  The weather was misty.  (Dkts. 106-28 ¶ 6; 112 ¶ 6.)  While driving between 60 and 66 mph, King rear-ended Plaintiff's vehicle.  (Dkts. 106-28 ¶ 7; 112 ¶ 7.)  The accident happened at about 9:26 that morning.  (Dkts. 106-28 ¶8; 112 ¶ 8.)

King immediately underwent a drug and alcohol screen, both of which were negative.  (Dkts. 108-7 ¶ 22; 114 ¶ 22.)  He was not driving

---

[1] Plaintiff responded to King's and Western's statements of facts and set forth its statements of additional facts in the same documents (Dkts. 112; 114) and restarted the paragraph numbering.  This means that in each document there are two of each paragraph number.  For Plaintiff's responses to King's and Western's statements of facts, the Court cites Dkt. 112 and Dkt. 114, respectively.   For Plaintiff's statements of additional facts as to King's and Western's motions, the Court cites Dkt. 112(A) and Dkt. 114(A), respectively.  Additionally, some of Plaintiff's additional facts in Dkt. 112(A) are argumentative and thus excluded. (*See, e.g.*, Dkt. 112(A) ¶ 11.)  Facts do not need lawyer commentary.

under the influence nor was he using his cellphone.  (Dkts. 106-28 ¶ 19; 112 ¶ 19.)  King testified it was "possible" he dozed off, but he was "not even sure."  (Dkt. 106-22; *see also* Dkts. 112(A) ¶ 16; 116 ¶ 16.)  Law enforcement cited King for driving too fast for the conditions and following too close.  (Dkts. 106-28 ¶ 9; 112 ¶ 9; 108-7 ¶ 21; 114 ¶ 21.)  He paid the fines.  (Dkts. 106-28 ¶ 9; 112 ¶ 9.)  King did not violate any company regulations regarding the hours he was permitted to work as he was coming off a 34-hour reset over the weekend before the Monday-morning accident.  (Dkts. 108-7 ¶ 23; 114 ¶ 23.)

Plaintiff sued King and Western for injuries he allegedly suffered in the accident.  Plaintiff alleges King is liable for driving too fast for the conditions, in violation of O.C.G.A. § 40-6-180; following too closely, in violation of O.C.G.A. § 40-6-9; and failing to maintain a proper lookout for other traffic.  (Dkts. 108-7 ¶ 4; 114 ¶ 4.)  Plaintiff alleges Western is liable for negligent hiring, retention, and/or supervision of King and negligent entrustment of the vehicle to King.  (Dkts. 108-7 ¶ 5; 114 ¶ 5.)  She seeks punitive damages against both King and Western.  (Dkts. 108-7 ¶ 6; 114 ¶ 6.)

During discovery, the parties obtain information about King's driving record and employment with Western.  King has worked as a commercial truck driver since 1986. (Dkts. 106-28 ¶ 10; 112 ¶ 10.)  In the 1980s, Virginia and Maryland suspended his commercial driver's licenses. (Dkts. 106-28 ¶¶ 22–23; 112 ¶¶ 22–23.)  And in 1990, Alabama suspended his commercial driver's license for 90 days after he refused to take a breathalyzer test. (Dkts. 106-28 ¶ 25; 112 ¶ 25.)  Western admits it would not have hired King had it known about these previous suspensions. (Dkts. 114(A) ¶ 5; 119 ¶ 5.)

King began working for Western in 2006. (Dkts. 106-28 ¶ 10; 112 ¶ 10; 108-7 ¶ 7; 114 ¶ 7.)  At the time, Western required its drivers to have three years of work experience, experience with hazardous material, and no more than two moving violations and one preventable incident within the previous five years. (Dkts. 108-7 ¶¶ 9–10; 114 ¶¶ 9–10.)  Western conducted a motor vehicle records check on King's commercial license going back five years and concluded he met the criteria to be hired as a driver. (Dkts. 108-7 ¶ 8; 114 ¶ 8.)  Western also required King to take a road test and exam, both of which he passed. (Dkts. 108-7 ¶ 12; 114 ¶ 12.)  Western conducted annual records checks

on King and determined he remained qualified to continue driving. (Dkts. 108-7 ¶¶ 13–14; 114 ¶¶ 13–14.)

King never received any citations for driving too fast for the conditions or following too close while at Western prior to the day of the accident at issue.  (Dkts. 106-28 ¶ 11; 112 ¶ 11; 108-7 ¶ 16; 114 ¶ 16.) But, a report from a member of the public in May 2007 alleged King tailgated another car and reports from members of the public in September 2016 alleged King made an unsafe lane change.  (Dkts. 106-28 ¶¶ 12–13; 112 ¶¶ 12–13; 114(A) ¶ 9; 119 ¶ 9.)  No one was hurt in those incidents, and Western did not discipline him for them.  (Dkts. 106-28 ¶¶ 14, 20; 112 ¶¶ 14, 20.)  During his tenure at Western (and before the accident with Plaintiff), King was involved in three motor vehicle incidents.  (Dkts. 106-28 ¶ 15; 112 ¶ 15.)  Two of those incidents occurred while King was driving his personal vehicle.  (*Id.*)  He was not cited for any of them.  (*Id.*)

A full history of King's driving and discipline record while employed with Western is unavailable because a fire destroyed his personnel file in 2018.  (Dkts. 114(A) ¶ 6; 119 ¶ 6.)  Existing records, however, show King had several regulatory violations while working at Western, including

11-hour rule violations in November 2006, December 2010, and May 2012; 14-hour rule violations in October 2006 and November 2013; fueling while off duty or in sleeper berth violations in January 2007, June 2007, March 2008, February 2011, and March 2011; and shorted 10-hour breaks in January 2008 and August 2009. (Dkts. 114(A) ¶ 8; 119 ¶ 8; *see also* 106-28 ¶ 17; 112 ¶ 17.)

Under consideration by the Court at this time are two motions for leave to file matters under seal (Dkts. 98; 110), a motion to exclude expert testimony (Dkt. 101), and two motions for partial summary judgment (Dkts. 106; 108).

## II.   Motions for Leave to File Matters Under Seal

### A.   Legal Standard

The filing of documents under seal is generally disfavored since all documents filed with the court are presumptively public.  "Once a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case."  *Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013, 1016 (11th Cir. 1992).  And "[t]he common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process."  *Chi. Trib. Co. v.*

*Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001). A party seeking to have material sealed can overcome the common-law right of access by a showing of good cause where there is "a sound basis or legitimate need to take judicial action." *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir. 1987). A good cause determination "requires 'balancing the asserted right of access against the other party's interest in keeping the information confidential.'" *Romero v. Drummond Co.*, 480 F.3d 1234, 1246 (11th Cir. 2007) (quoting *Chi. Trib.*, 263 F.3d at 1309). Essentially, good cause exists where "[a] party's privacy or proprietary interest in information . . . overcomes the interest of the public in accessing the information." *Id.* The decision of whether good cause exists rests with the sound discretion of the district court judge and "should be informed by a 'sensitive appreciation of the circumstances that led to the production of the particular document in question.'" *Chi. Trib.*, 263 F.3d at 1311 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 603 (1978)).

## B.   Background

The parties originally asked for all documents discussing Plaintiff's psychiatric treatment or evaluations to be filed under seal. (Dkts. 98;

110.)  The Court reviewed the materials, found the entirety of each requested document should not be sealed, and ordered the parties to provide a specific description of exactly what information (down to the page and word) in each document should be under seal.  (Dkt. Entry Dated 12/14/2021.)  The parties supplemented their filings.  (Dkt. 122; 123; 124.)  For each document, they said whether everything, nothing, or only portions needed to be sealed.

### C.    Analysis

There is limited, if any, public interest in allowing public access to Plaintiff's mental health records and diagnoses, and any limited interest is vastly outweighed by the right to keep such records private.  The parties have shown good cause for sealing the contents of Plaintiff's psychiatric evaluations and mental health diagnoses. The Court will not, however, seal the mere mention that Plaintiff has undergone a mental health evaluation, as the parties have already made that part of the public record.

The Court addresses each filing individually:

| Original | Redacted | Conclusion |
|----------|----------|------------|
| Dkt. 97 | None, sealing not requested anymore | Lift provisional seal |
| Dkt. 97-1 | Dkt. 124-1 | Permanently seal |

8

| Dkt. 97-2 | Dkt. 124-2 | Permanently seal |
|---|---|---|
| Dkt. 97-3 | None, seeking to seal entire document | Permanently seal |
| Dkt. 97-4 | None, sealing not requested anymore | Lift provisional seal |
| Dkt. 100 | Dkt. 122 | Lift provisional seal |
| Dkt. 100-1 | Dkt. 122-1 | Permanently seal |
| Dkt. 100-2 | Dkt. 122-2 | Permanently seal |
| Dkt. 100-3 | Dkt. 122-3 | Permanently seal |
| Dkt. 101 | Dkt. 123 | Lift provisional seal |
| Dkt. 101-1 | Dkt. 123-1 | Permanently seal |
| Dkt. 101-2 | Dkt. 123-2 | Lift provisional seal |
| Dkt. 101-3 | Dkt. 123-3 | Permanently seal |
| Dkt. 101-4 | Dkt. 123-4 | Permanently seal |
| Dkt. 101-5 | Dkt. 123-5 | Permanently seal |
| Dkt. 101-6 | Dkt. 123-6 | Lift provisional seal |
| Dkt. 101-7 | Dkt. 123-7 | Permanently seal |
| Dkt. 101-8 | Dkt. 123-8 | Permanently seal |
| Dkt. 101-9 | Dkt. 123-9 | Lift provisional seal |
| Dkt. 101-10 | Dkt. 123-10 | Lift provisional seal |
| Dkt. 101-11 | Dkt. 123-11 | Permanently seal<br><br>The Court will permanently seal the address on page 3, but it will not seal the redactions on page 8.[2] |
| Dkt. 101-12 | Dkt. 123-12 | Lift provisional seal |
| Dkt. 101-13 | Dkt. 123-13 | Permanently seal |
| Dkt. 101-14 | Dkt. 123-14 | Permanently seal |

[2] As explained above, the fact Plaintiff has undergone mental health treatment is not subject to seal.  The parties at no point moved to seal anything pertaining to the fact they engaged in settlement negotiations so good cause has not been shown for those redactions.  In any event, the Court would not be inclined to seal the mere fact the parties have exchanged settlement offers/demands; the contents of those offers/demands, however, would be appropriate for sealing.

| Dkt. 101-15 | Dkt. 123-15 | Permanently seal |
|---|---|---|
| Dkt. 101-16 | Dkt. 123-16 | Permanently seal |
| Dkt. 101-17 | Dkt. 123-17 | Permanently seal |
| Dkt. 101-18 | Dkt. 123-18 | Permanently seal |
| Dkt. 101-19 | Dkt. 123-19 | Lift provisional seal |
| Dkt. 101-20 | Dkt. 123-20 | Lift provisional seal |
| Dkt. 101-21 | Dkt. 123-21 | Lift provisional seal |
| Dkt. 101-22 | Dkt. 123-22 | Permanently seal |
| Dkt. 101-23 | Dkt. 123-23 | Lift provisional seal |
| Dkt. 101-24 | Dkt. 123-24 | Lift provisional seal |
| Dkt. 101-25 | Dkt. 123-25 | Lift provisional seal |
| Dkt. 101-26 | Dkt. 123-26 | Permanently seal |
| Dkt. 101-27 | Dkt. 123-27 | Permanently seal |
| Dkt. 101-28 | Dkt. 123-28 | Lift provisional seal |
| Dkt. 101-29 | Dkt. 123-29 | Lift provisional seal |
| Dkt. 109 | Dkt. 124-3 | Permanently seal |
| Dkt. 109-1 | Dkt. 124-4 | Lift provisional seal |
| Dkt. 109-2 | None, seeking to seal entire document | Permanently seal |
| Dkt. 109-3 | None, sealing not requested anymore | Lift provisional seal |
| Dkt. 109-4 | None, the redactions were present in the original | Lift provisional seal<br><br>The Court will not seal any of the redactions.[3] |
| Dkt. 109-5 | Dkt. 124-5 | Permanently seal<br><br>The Court will not seal the redactions on page 4,[4] nor will it seal the redactions in the numbered paragraphs on page 1 or the mention of "psych privilege."  The Court will, however, seal the redacted language |

---

[3] *See supra* note 2.

[4] *See supra* note 2.

| | | immediately following "the exception of the" on page 1. |
|---|---|---|
| Dkt. 109-6 | Dkt. 124-6 | Lift provisional seal |
| Dkt. 109-7 | Dkt. 124-7 | Permanently seal |
| Dkt. 109-8 | Dkt. 124-2 | Permanently seal |
| Dkt. 109-9 | None, sealing not requested anymore | Lift provisional seal |
| Dkt. 109-10 | None, sealing not requested anymore | Lift provisional seal |
| Dkt. 109-11 | None, sealing not requested anymore | Lift provisional seal |
| Dkt. 109-12 | None, seeking to seal entire document | Permanently seal |
| Dkt. 109-13 | None, sealing not requested anymore | Lift provisional seal |
| Dkt. 109-14 | Dkt. 124-8 | Permanently seal |
| Dkt. 109-15 | None, sealing not requested anymore | Lift provisional seal |
| Dkt. 109-16 | None, seeking to seal entire document | Permanently seal |
| Dkt. 109-17 | Dkt. 124-9 | Permanently seal |

## III.  Motion to Exclude Expert Testimony

### A.    Legal Standard

Trial courts serve a critical gate-keeping function for the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  Expert testimony can be particularly persuasive, and as such, the role of the trial court is to keep speculative and unreliable testimony from reaching the jury. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).  The gatekeeping

11

function, however, "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Federal Rule of Evidence 702 governs the admissibility of expert opinions:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In determining the admissibility of expert testimony under Rule 702, the Eleventh Circuit employs a rigorous three-part inquiry. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). That is, expert testimony is admissible when

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).  The admissibility of an expert's opinion thus turns on three things: qualification, reliability, and helpfulness.  As for reliability, trial courts must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.  To evaluate the reliability of scientific expert opinion, trial courts consider, to the extent practicable: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.  *Frazier*, 387 F.3d at 1262.  "These factors are illustrative, not exhaustive [and] not all of them will apply in every case . . . ."  *Id.* The same criteria may be used to evaluate the reliability of non-scientific testimony.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

**B.     Plaintiff's Motion to Exclude**

Plaintiff moves to exclude all testimony by Judith Cohen, M.D.; Thomas G. Burns, Psy. D., ABPP; and Michael C. Hilton, M.D. (Dkt. 101.) Defendants have withdrawn Dr. Burns (Dkt. 109 at 19), so that portion of Plaintiff's motion is denied as moot. The Court addresses Drs. Hilton and Cohen separately below.

### 1.     Dr. Hilton

Plaintiff seeks to exclude Dr. Hilton based on Defendants' failure to timely provide deposition dates and alternatively under Rule 702.

#### a)     Timeliness

Local Rule 26.2(C) provides in relevant part:

> Any party who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert and, if desired, to name its own expert witness sufficiently in advance of the close of discovery so that a similar discovery deposition of the second expert might also be conducted prior to the close of discovery.
>
> Any party who does not comply with the provisions of the foregoing paragraph shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by Court order based upon a showing that the failure to comply was justified.

LR 26.2(C), NDGa.  This case has a tortured procedural history.  The Court amended the scheduling order four times—each at the parties' request and each extending the deadline for expert designations—the last time being on June 4, 2021.  (Dkts. 56; 62; 70; 75-1; Dkt. Entry Dated 6/4/2021.)  The first three pushed expert designations and depositions from October/November 2020 to February/April 2021 and then to June/August 2021.  The fourth extended the deadline for Plaintiff to designate her experts to August 4th and to produce those experts for depositions to August 25th.  (Dkt. 75-1; Dkt. Entry Dated 6/4/2021.)  It also extended the deadline for Defendants to designate their experts to September 16th and to produce those experts for depositions to October 6th.  (*Id.*)

Plaintiff disclosed Dr. Rouse on June 4th and offered to produce him for a deposition on August 25th—the day of the deadline.  (Dkt. 101-13.)  On August 26th, defense counsel informally communicated that Defendants had retained Dr. Hilton.  (Dkt. 101-17 at 6.)  On September 1st, Plaintiff requested dates to depose the experts before the October 6th deadline.  (*Id.* at 4.)  On September 15th, Defendants formally designated Dr. Hilton as a testifying expert.  (Dkt. 92.)  The following morning,

Plaintiff again requested dates for Dr. Hilton's deposition. (Dkt. 101-18 at 1.) Defendants offered three dates—October 8th, October 29th, or November 5th—all of which were past the October 6th deadline set by the Court. (Dkt. 101-19.) On September 24th, Plaintiff offered October 1st or 5th and said the deposition at least needed to be done before October 23rd. (Dkt. 101-21.) On September 27th, Plaintiff again requested Defendants make their experts available no later than October 23rd so that they could "comply with the remaining deadlines." (Dkt. 101-22 at 2.) That same day, Defendants responded that Dr. Hilton has a busy schedule and asked if the dates previously provided work for Plaintiff. (*Id.* at 1.)

On September 28th, Plaintiff noticed the deposition of Dr. Hilton for October 5th and sent a cover letter explaining the need to notice the depositions within the Court's deadline but offering to take the deposition on October 29th, a date Defendants had originally offered for Dr. Hilton. (Dkts. 95; 101-23.) Defendants said Dr. Hilton was unavailable for the noticed deposition on October 5th and again asked if the dates provided later in October worked for Plaintiff. (Dkt. 101-25.) According to Plaintiff, Defendants never made Dr. Hilton available within the time

allotted by the Court or on any later date.  (Dkt. 101-1 at 10.)  It is hard to understand why the parties were unable to accomplish the simple task of disclosing and deposing expert witnesses within the large discovery extensions the Court provided.  They ought to be embarrassed by their inability to do so.

Defendants set forth two arguments to explain their failure to complete discovery.  First, Defendants take the position that Plaintiff was so late in making her disclosures that it gave the parties limited time to address Defendants' experts.  (Dkt. 109 at 7–11.)  The Court does not find this argument persuasive.  Plaintiff disclosed her psychiatric records before the close of discovery and disclosed Dr. Rouse by the August 25th deadline.   Second, Defendants contend Plaintiff's counsel agreed to conduct expert depositions after the scheduling order deadline and were provided dates for Dr. Hilton within the extended period agreed to by the parties.  (Dkt. 109 at 9.)  Plaintiff does not address this argument.  (*See generally* Dkt. 120 at 2–3.)

It is apparent from the email exchanges between counsel that Plaintiff agreed to conduct Dr. Hilton's deposition after the scheduling order deadline, as long as it happened before October 23rd.  Defendants

offered three dates—October 8th, October 29th, or November 5th—and repeatedly asked if any of those dates worked for Plaintiff.  In the briefs, the parties do not explain why Dr. Hilton's deposition was not conducted on any of those dates.  *Based on the records before the Court at this moment*, it appears both parties are to blame for this issue.  Defendants should have made their expert available before the Court's deadline, but after the parties agreed to depose Dr. Hilton after the Court's deadline, Plaintiff's counsel became uncooperative and nonresponsive about the offered dates.  Under these circumstances, the Court declines to strike Dr. Hilton.

To be clear, the Court does not approve taking depositions after the Court's deadlines.  *Why even ask the Court to extend the deadline if the parties believe they can just act as they wish?*  Were it not for Plaintiff's acquiescence in that regard, the Court would exclude Dr. Hilton's testimony without hesitation.   Dr. Hilton's busy schedule also is Defendants' problem, not Plaintiff's.  Parties must ensure their expert is available to opposing counsel within the Court's deadlines.  Striking an expert, however, is a drastic remedy.  And the parties agreed to conduct the deposition after the Court's deadline.  The Court is not sure why that

did not happen.  Nonetheless, the Court thinks Plaintiff should get to depose Dr. Hilton within thirty (30) days of this order.  Should Defendants fail to make Dr. Hilton available within thirty (30) days of this order—and the parties may not extend that deadline between themselves—the Court will grant Plaintiff's motion to strike.

> **b)  Reliability**

Alternatively, Plaintiff seeks to exclude Dr. Hilton under Rule 702 because his opinions are not reliable.  (Dkt. 101-1 at 21–24.)[5]  The Court begins by giving a brief overview of Dr. Hilton's opinions and how they fit into this case.  Dr. Rouse, Plaintiff's expert who has since been withdrawn, opined that Plaintiff suffered from ████████████████ █████████████████████  and that other medical condition was

---

[5] Plaintiff makes a passing reference to Dr. Hilton's opinions not being helpful to the jury.  (Dkt. 101-1 at 23.)  An off-hand remark with no substantive argument does not raise an issue adequately.  *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it.").  So the Court declines to consider this ground.  But even if it did consider it, the Court would find Dr. Hilton's opinions are helpful to the jury in the light of Plaintiff seeking to recover damages based on her mental health issues and Dr. Hilton opining about Plaintiff's mental health condition.

████████████████████████████████ (Dkt. 109-2 at 8.)  Dr.

Hilton opined to the contrary:



(Dkt. 109-12 at 13.)[6]

Plaintiff argues Dr. Hilton presented no information that "could possibly satisfy the differential diagnosis standard."  (Dkt. 101-1 at 22.) "The differential diagnosis process requires a physician to list the known possible causes of a patient's symptoms, then, by utilizing diagnostic tests, eliminate causes from the list until the most likely cause remains."

---

[6] Plaintiff says Defendant disclosed Dr. Hilton solely to rebut Dr. Rouse's opinion about Plaintiff's diagnosis.  (Dkt. 120 at 4.) Given Plaintiff's withdrawal of Dr. Rouse (Dkt. 111), Plaintiff says Dr. Hilton's opinion is irrelevant and should be excluded for that reason (Dkt. 120 at 4).  Since Plaintiff raised this ground in its reply, the Court offered Defendants a chance to respond.  (Dkt. Entry Dated 5/3/2022.)  Defendants say Dr. Hilton offered a diagnosis—unrelated to the collision—that would explain Plaintiff's symptoms and condition.  (*See* Dkts. 109-12; 130 at 2.) Thus, to the extent Plaintiff offers testimony from treating physicians (or otherwise) linking Plaintiff's psychiatric treatment to the collision or testimony showing she suffered a traumatic brain injury from the collision, Dr. Hilton's opinions on the most likely cause of such a condition are relevant.  So the Court declines to exclude Dr. Hilton on this basis.

*Jazairi v. Royal Oaks Apartment Assocs., LP*, 2005 WL 6750570, at *9 (S.D. Ga. June 23, 2005).[7]  Defendants say Dr. Hilton reliably applied the differential diagnosis process and the DSM-5 criteria to the facts here. (Dkt. 109 at 20.)  In his report, Dr. Hilton explained that one of the criteria to reach a diagnosis of ███████████████████████ ████████████████ is that the diagnosis is "not better explained by another mental disorder."  (Dkt. 109-12 at 13.)  And, according to Dr. Hilton, ████████████ better explains Plaintiff's situation.  (*Id.*)  In support of his conclusion that ████████████ could not be ruled out, Dr. Hilton relied on Plaintiff's ██████████████████████ ████████████████, which he opined "greatly increase[d]" the risk of such mental illness in Plaintiff.  (*Id.*)  He also relied on Plaintiff's ████ ██████████████████████████████████████ which he opined also "greatly increased" the risk of Plaintiff having ████████

---

[7] *See also id.* at *4 n.13 ("Differential diagnosis involves 'the determination of which two or more diseases with similar symptoms is the one from which a patient is suffering from based on an analysis of the clinical data.'"); *Pierre v. Intuitive Surgical, Inc.*, 854 F. App'x 316, 320 n.4 (11th Cir. 2021) (per curiam) ("Differential diagnosis includes three steps: (1) the patient's condition is diagnosed, (2) all potential causes of the ailment are considered, and (3) differential etiology is determined by systematically eliminating the possible causes.").

████████.  (*Id.*)  Lastly, he relied on the fact Plaintiff received a ████████

████████████████ when she was ██████████████████████ the second

time.  (*Id.*)  Plaintiff does not respond to this explanation.  (Dkt. 120 at

2–4 (as to Dr. Hilton, only responding to Defendants' arguments on the

timeliness issue).)

Plaintiff also says Dr. Hilton's opinions are unreliable because he

seems to reject Dr. Rouse's diagnosis simply because it is rare or less

common.  (Dkt. 101-1 at 22–23.)  Defendants contend this argument

evidences a misunderstanding of Dr. Hilton's report.  (Dkt. 109 at 22.)

The Court agrees.  Dr. Hilton's report makes clear that he does not reject

Dr. Rouse's opinion only because it is a rare diagnosis.  Based on the

DSM-5 criteria and differential diagnosis process, Dr. Hilton determined

that ████████████ could not be ruled out and was a more likely

diagnosis based on Plaintiff's familial and personal history.  (Dkt. 109-

12.)

The Court finds Dr. Hilton's opinions are reliable.  The Court denies

Plaintiff's motion to exclude Dr. Hilton.

### 2.   Dr. Cohen

Plaintiff seeks to exclude Dr. Cohen under Rule 702 because her opinions are irrelevant.  (Dkt. 101-1 at 16.)   Plaintiff says Defendant disclosed Dr. Cohen solely to dispute one finding in Dr. Rouse's report. (*Id.* at 17.)  Given Plaintiff's withdrawal of Dr. Rouse (Dkt. 111), Plaintiff says Dr. Cohen's opinion is "utterly irrelevant" (Dkt. 120 at 4). Defendants disagree, arguing Dr. Cohen is offered to provide an expert opinion on the findings in Plaintiff's March 2021 MRI report.  (Dkts. 109 at 13; 130 at 2.)  That MRI report states:



(Dkt. 100-1 at 101.)  Dr. Cohen opines to the contrary, saying the imaging does not support a finding of a ███████████ .  (Dkts. 99-1; 130 at 3.)[8]

---

[8] Plaintiff suggests that Dr. Cohen's opinion that the MRI results do not support a finding of a ██████████ is irrelevant because defense expert Dr. Hilton agreed Plaintiff had a ███████████ .  (Dkt. 101-1 at 17.)  But that is not true.  Dr. Hilton's discussion of a ████████████ is confined to his summary of Dr. Rouse's finding that Plaintiff suffered a ████████ ████████  (*See* Dkt. 109-12 at 7, 9.)

Thus, to the extent Plaintiff intends to pursue psychiatric damages and/or a claim for traumatic brain injury through avenues other than Dr. Rouse, Dr. Cohen's opinions are relevant to rebut any such testimony or evidence. The Court denies Plaintiff's motion to exclude Dr. Cohen.

## IV. Motions for Summary Judgment

### A. Legal Standard

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 1361 (citing *Anderson*, 477 U.S. at 248).

The party moving for summary judgment bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp.*

24

*v. Catrett*, 477 U.S. 317, 323 (1986)).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247–48.  A district court must "resolve all reasonable doubts about the facts in favor of the non-movant[] and draw all justifiable inferences in his or her favor."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alteration adopted) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

**B.   King's Motion for Partial Summary Judgment**

King moves for summary judgment on Plaintiff's claim for punitive damages.  (Dkt. 106.)  Under Georgia law, punitive damages may be

awarded in tort actions only when "it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b).  In other words, "aggravati[ng]" or "outrage[ous]" circumstances such as spite, malice, or evil or fraudulent motive on the defendant's behalf must be present to warrant punitive damages. *Colonial Pipeline Co. v. Brown*, 365 S.E.2d 827, 832 (Ga. 1988).  "Mere negligence, even gross negligence, will not support an award of punitive damages." *Harris v. Leader*, 499 S.E.2d 374, 378 (Ga. Ct. App. 1998).  In cases involving motor vehicle collisions, "punitive damages are not recoverable where the driver at fault simply violated a rule of the road," but they are recoverable "where the collision resulted from a pattern or policy of dangerous driving," such as excessive speeding or driving while intoxicated. *Carter v. Spells*, 494 S.E.2d 279, 281 (Ga. Ct. App. 1997).

Whether a defendant's conduct is sufficient to warrant punitive damages is generally a jury question.  *Weller v. Blake*, 726 S.E.2d 698, 703 (Ga. Ct. App. 2012).  But "summary judgment is appropriate if the . . . record does not suggest that a plaintiff could carry his burden of proof

by showing clear and convincing evidence that the defendant acted with the requisite intent." *Dickerson v. Am. Nat'l Prop. & Cas. Co.*, 2009 WL 1035131, at *9 (M.D. Ga. Apr. 16, 2009).

So two avenues exist for recovering punitive damages in this case: (1) King's actions that led to this collision were sufficiently aggravating or outrageous *or* (2) the collision resulted from a pattern or policy of dangerous driving. King argues neither are present and cites undisputed facts in support of his argument. (Dkt. 106-1 at 6–10.) In response, Plaintiff focuses only on the former and makes no argument about the latter. (*See* Dkt. 113 at 10–14.)[9] Plaintiff has thus abandoned the pattern-or-policy avenue for recovering punitive damages. *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (holding a non-

---

[9] Plaintiff makes a passing reference to King's driving history in a footnote at the end of her opposition brief. (*See* Dkt. 113 at 14 n.7 ("Plaintiff also shows that Defendant King's persistent rule violations, as detailed in Plaintiff's Response to Defendant's Western's MPSJ at 3-7, indeed demonstrate a pattern and practice of willful disregard of such rules designed to prevent fatigue.").) A passing reference in a footnote without any factual support or legal argument is wholly inadequate. *See Paskowsky v. Comm'r of Soc. Sec.*, 2018 WL 834749, at *5 (M.D. Fla. Feb. 13, 2018) (a brief statement in a footnote is insufficient to adequately raise an issue); *Hamilton*, 680 F.3d at 1319 ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it.").

movant's silence on an issue after a movant raises the issue in a summary judgment motion is construed as an abandonment of the claim); *see, e.g.*, *Mosley v. Ala. Unified Jud. Sys., Admin. Off. of Cts.*, 562 F. App'x 862, 866 (11th Cir. 2014) (per curiam) ("The district court did not err in determining that Mosley abandoned any grounds of racial discrimination by failing to address them in her opposition brief to the motion for summary judgment."). Accordingly, her only avenue for recovering punitive damages against King is that his conduct was sufficiently aggravating or outrageous to create a fact question.

King argues the facts and circumstances of this collision are not aggravating or outrageous. (Dkts. 106-1 at 6–7.) The Court agrees. King received two citations for this collision: driving too fast for the conditions and following too close. But these are violations of the "rules of the road," which, standing alone, cannot support a claim for punitive damages. *Clark v. Irvin*, 2011 WL 13152865, at *7 (M.D. Ga. May 31, 2011) ("[T]he Court finds that Defendant Irvin's conduct only constituted violations of rules of the road—FMCSR and Georgia statutory provisions—and therefore would be considered, at most, negligence or negligence per se, which cannot alone support an award of punitive damages."). King was

not driving under the influence nor was he using his cellphone. *See, e.g.*, *Ballard v. Keen Transport, Inc.*, 2011 WL 203378, at *4 (S.D. Ga. Jan. 19, 2011) (punitive damages not warranted when the defendant drove 11 mph above the speed limit and failed to keep a proper lookout because those are violations of road rules and there was no evidence of malice or aggravating circumstances); *Durben v. Am. Materials, Inc.*, 503 S.E.2d 618 (Ga. Ct. App. 1998) (affirming summary judgment on punitive damages claim where the police report indicated the driver was not under the influence and was only cited for following too closely); *Bradford v. Xerox Corp.*, 453 S.E.2d 98 (Ga. Ct. App. 1994) (defendant's speeding on wet roads did not warrant punitive damages absent evidence of aggravating circumstances); *Coker v. Culter*, 431 S.E.2d 443 (Ga. Ct. App. 1993) (punitive damages not warranted even though the defendant was speeding on wet roads in poor visibility, had alcohol in his system, and had drug paraphernalia in his car).

In opposing summary judgment, Plaintiff sets forth an either/or scenario to argue sufficiently aggravating circumstances exist: King either "(1) ignored traffic slowing ahead of him with approximately 40 seconds of braking by the vehicles ahead of him with clear line of sight

and drove his tractor-trailer loaded with acetylene into Plaintiff's vehicle or (2) dozed off at the wheel." (Dkt. 113 at 13.) The problem is that these scenarios are pure speculation and not supported by the facts. Putting that aside, however, they do not create a genuine issue of fact. With the first scenario, Plaintiff says King was "so profoundly distracted that his behavior warrants punitive damages." (*Id.*) But case law shows distracted driving alone does not give rise to punitive damages. In *Ballard*, for example, the defendant was traveling 11 mph over the speed limit when he rear-ended the plaintiff's vehicle. 2011 WL 203378, at *1. The defendant admitted he took his eyes off the road to put his drink in the drink holder, and the responding officer found he was following too close. *Id.* The court found these circumstances did not justify punitive damages. *Id.* at *4. The Court agrees with that analysis, and Plaintiff's first scenario thus fails. King allegedly being "so profoundly distracted" he did not notice traffic slowing does not alone justify punitive damages. *See Batts v. Crete Carrier Corp.*, 2009 WL 6842545, at *2 (N.D. Ga. Dec. 14, 2009) (the fact the defendant never slowed down, never braked, and smashed into the plaintiff's car "only shows" he was not paying attention

to the road and "[t]his type of carelessness does not support an award of punitive damages").

In Plaintiff's second scenario, she says King dozed off at the wheel despite being "trained to recognize the signs and triggers of fatigue." (Dkt. 113 at 13–14.)  A jury, Plaintiff argues, could reasonably find King willfully chose to ignore the signs of fatigue and continued driving.  (*Id.* at 14.)  Falling asleep at the wheel does not justify an award of punitive damages unless there is some evidence the driver consciously ignored the risk of fatigue.  *See Batts*, 2009 WL 6842545, at *2; *see also Bartja v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 463 S.E.2d 358 (Ga. Ct. App. 1995). Here, it is entirely speculative that King experienced signs of fatigue, chose to ignore them, and then fell asleep at the wheel.  King testified it was "possible" he dozed off, but he was "not even sure."  (Dkt. 106-22.) The Court is not aware of any evidence that supports a finding King did indeed doze off.  And even if there was evidence he fell asleep, there is certainly no evidence he experienced symptoms of fatigue and then intentionally disregarded those symptoms and kept driving, which is necessary to justify an award of punitive damages on this basis.  At its core, Plaintiff's second scenario is nothing more than speculation (that he

fell asleep) upon speculation (that before doing so he intentionally ignored signs of fatigue). Such rank supposition untethered to evidence other than the fact of an accident is not enough to avoid summary judgment.

For these reasons, King is entitled to summary judgment on punitive damages.

## C.   Western's Motion for Partial Summary Judgment

Western moves for summary judgment on Plaintiff's claims for negligent hiring, retention/supervision, and entrustment and punitive damages. (Dkt. 108.)[10] The Court will first analyze whether Plaintiff has presented sufficient evidence to support her negligent hiring, retention/supervision, and entrustment claims and then determine if the

---

[10] King has admitted he caused the collision, and Western has admitted King was acting in the course and scope of his employment at the time of the collision. Under Georgia's Respondeat Superior Rule, once an employer acknowledges vicarious liability for its employee's negligence, a plaintiff's direct negligence claims against the employer are barred. In *Quynn v. Hulsey*, 850 S.E.2d 725 (Ga. 2020), however, the Georgia Supreme Court held the state's apportionment liability statute, O.C.G.A. § 51-12-33, abrogated that rule. *See id.* (trial court thus erred in granting summary judgment to the employer on plaintiff's claims of negligent entrustment, hiring, training, and supervision based on the fact that the employer had admitted the applicability of respondeat superior).

facts present the necessary amount of culpability to support her punitive damages claim against Western.

### 1.   Negligent Hiring and Retention/Supervision

An employer may be held liable for hiring or retaining an employee the employer knows or should have known was not suited for the particular employment. *Munroe v. Universal Health Servs., Inc.*, 596 S.E.2d 604, 605 (Ga. 2004). For the employer to be held liable, there must be a causal connection between the employee's particular incompetency for the job and the injury sustained by the plaintiff. *See id.* at 606; *Edwards v. Comtrak Logistics, Inc.*, 2014 WL 11820247, at *9 (N.D. Ga. Mar. 5, 2014) ("An employer may be held liable for negligent supervision only where there is sufficient evidence to establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff."). Western says Plaintiff's negligent hiring claim fails because it is undisputed (1) it compiled with federal regulations related to checking King's driving record, (2) King met the criteria to be hired as a driver, (3) Western had no knowledge of King's previous license

suspensions, and (4) any prior suspensions are too remote for there to be a causal connection to the collision here.  (Dkt. 108-1 at 15.)

Even if an employer complies with federal regulations, it can still be liable for negligent hiring if it violated its own hiring procedures.  *See Karr v. Celadon Trucking Servs., Inc.,* 2017 WL 11084520, at *5 (N.D. Ga. Nov. 3, 2017); *W. Indus., Inc. v. Poole*, 634 S.E.2d 118, 122 & n.14 (Ga. Ct. App. 2006).  Plaintiff says King testified he would have informed Western about his license suspensions if asked and Western testified King would *not* have been hired had it known about King's license suspensions.  (Dkt. 115 at 11.)  According to Plaintiff, Western's "technology, practices, and policies failed to capture this critical information" and Western "did not bother to ask its own putative hire enough questions to elicit information which Defendant King would have readily shared." (*Id.*)  So, Plaintiff argues, a jury could conclude Western negligently violated its own hiring standards.  (*Id.*)

The Court disagrees.  Western specifically asked King in the employment application whether any of his licenses had ever been suspended or revoked.  (*See* Dkt. 118 at 2 (citing Dkt. 108-4 at 5).)  He

answered "No."   (*Id.*)[11]   He also certified all the information in the application was true and complete.   (*Id.*)   The record is devoid of any evidence Western failed to follow its own procedures in the hiring of King. And Western compiled with its regulatory responsibilities.   Federal regulations required it to investigate King's motor vehicle record in each state where he held a license for the previous three years.   49 C.F.R. § 391.23.   Western conducted a five-year motor vehicle check on King and concluded he met the criteria to be hired as a driver.   Western's human resource department also reviewed King's prior employment history. (Dkt. 108-2 ¶ 12.)

Western argues it is entitled to summary judgment on Plaintiff's negligent retention/supervision claim because there is nothing in King's driving record that would have caused it to know or reasonably to have known that King had a tendency to engage in behavior relevant to the injuries suffered by Plaintiff.  (Dkt. 108-1 at 15–18.)  Plaintiff says a jury

---

[11] In fact, however, King's Virginia license was suspended in the 1980s for speeding tickets, his Maryland license was suspended in the 1980s for failing to come to a complete stop and speeding tickets, and his previous Alabama license was suspended in 1990 for failing to take a breathalyzer test.  (Dkt. 108-6 ¶ 21.)  His current Alabama license, which he had when he applied to work for Western, was issued in 1994 and has never been revoked, canceled, suspended, or expired.  (*Id.* ¶¶ 21, 23.)

would have "ample evidence" from which to conclude Western negligently retained King. (Dkt. 115 at 11.) Plaintiff argues King's regulatory violations (i.e., the 11-hour rule violations, 14-hour rule violations, fueling while off duty or in sleeper berth violations, and shorted 10-hour break violations) are "all related to what transpired on the day of the subject collision, as each of these violations demonstrates a pattern and practice of disregarding the rules and regulations related to driver fatigue—precisely what Defendant King admitted may have occurred." (*Id.* at 11–12.)[12] This conclusory statement is insufficient to withstand summary judgment. "In order to defeat summary judgment on th[e] issue [of negligent retention/supervision], a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue." *Remediation Res., Inc. v. Balding*, 635 S.E.2d 332, 335 (Ga. Ct. App. 2006). Plaintiff set forth no argument on how the behavior at issue in those violations is relevant to the injuries she incurred, and she did not proffer any expert testimony indicating such behavior is relevant to the injuries she suffered. *See, e.g.*, *Edwards*, 2014 WL

---

[12] As explained above, King testified it was "possible" he dozed off, but he was "not even sure." (Dkt. 106-22.)

11820247, at *9 (declining to grant summary judgment on the log falsification and driving over hours arguments because plaintiff's expert provided testimony that made such behavior relevant to the injuries he suffered).  And the undisputed evidence shows King did not violate any company or federal hours of service regulations on the day of the collision and he was coming off at least a 34-hour reset over the weekend before this incident happened on Monday morning.  (Dkt. 108-2 ¶ 24.)

Western is entitled to summary judgment on the negligent hiring and retention/supervision claims.

### 2.    Negligent Entrustment

Under the doctrine of negligent entrustment, a party is liable if he entrusts someone with an instrumentality, with actual knowledge that the person to whom he has entrusted the instrumentality is incompetent or habitually reckless.  *Gunn v. Booker*, 381 S.E.2d 286, 290 (Ga. 1989).  A plaintiff must show the entrustor had "actual knowledge" of the entrustee's incompetency or habitual recklessness.  *W. Indus.*, 634 S.E.2d at 121 ("A claim for the negligent entrustment of a motor vehicle cannot succeed in the absence of a showing that an employer has 'actual knowledge' that the driver is incompetent or habitually reckless.").  In

37

other words, it is not sufficient for a plaintiff to show constructive knowledge. *Webb v. Day*, 615 S.E.2d 570, 573 (Ga. Ct. App. 2005); *see also Upshaw v. Roberts Timber Co.*, 596 S.E.2d 679, 682 (Ga. Ct. App. 2004) ("The entrustor is not liable merely because he or she, by the exercise of reasonable care and diligence, could have ascertained the fact of the incompetency of the driver.").

Western argues the record is devoid of any evidence suggesting Western had actual knowledge that King was incompetent or habitually reckless. (Dkt. 108-1 at 19–21.) King became a commercial truck driver in 1986 and began working for Western in 2006. 'A records check led it to conclude he met the criteria to be hired as a driver. From 2006 to the day of the incident, Western conducted annual checks, all of which indicated he could keep driving  King never got in trouble for driving too fast for the conditions or following too close before the accident at issue. None of the three motor vehicle incidents in which he was involved resulted in citations and two happened while he was driving his personal vehicle. Other than those incidents and the one at issue here, King had no other incidents.  This undisputed evidence placed the burden on

Plaintiff to produce specific evidence showing Western had actual knowledge that King was an incompetent or habitually reckless driver.

Plaintiff points to Western's knowledge of King's regulatory violations, such as 11-hour rule violations in November 2006, December 2010, and May 2012; 14-hour rule violations in October 2006 and November 2013; fueling while off duty or in sleeper berth violations in January 2007, June 2007, March 2008, February 2011, and March 2011; and shorted 10-hour break violations in January 2008 and August 2009. (Dkt. 115 at 13.)  Plaintiff says a reasonable jury could find Western negligently entrusted its vehicle to King based on these violations.  (*Id.*) In its reply, Western does not address these violations in the context of negligent entrustment.  (*See* Dkt. 118 at 7–8 (directing the Court to its opening brief for argument on why summary judgment is appropriate as to the negligent entrustment claim); *but see id.* at 5–7 (evaluating these violations in the context of negligent retention/supervision caselaw).) Case law suggests an employer's knowledge of a series of serious driving infractions by an employee creates a question of fact on the issue of negligent entrustment.  *See Dougherty Equip. Co. v. Roper*, 757 S.E.2d 885, 890 (Ga. Ct. App. 2014); *CGL Facility Mgmt., LLC v. Wiley*, 760

S.E.2d 251, 256–57 (Ga. Ct. App. 2014).  It is possible these infractions are not "serious" enough or perhaps they are too remote in time to create any liability issues for Western.  But, without argument on these issues, the Court declines to resolve them.  Western is not entitled to summary judgment on the negligent entrustment claim.

### 3.   Punitive Damages

Western moves for summary judgment on Plaintiff's punitive damages claim against it. (Dkts. 108; 108-1.)  Western set forth evidence and argument sufficient to discharge its initial burden on summary judgment. (*See* Dkt. 108-1.)  In her response brief, Plaintiff devotes three conclusory sentences and one case citation to punitive damages.  (Dkt. 115 at 14.)  She rests entirely on her response to King's motion for summary judgment.  (*Id.*)  Such incorporation by reference is impermissible, as this practice would incorporate approximately 14 more pages into her brief, thereby exceeding the page limit set forth in Local Rule 7.1(D).  *See Aldridge v. Travelers Home & Marine Ins. Co.*, 2019 WL 8439150, at *1 (N.D. Ga. Feb. 21, 2019); *Bryant v. Jones*, 2006 WL 584762, at *6 (N.D. Ga. Mar. 10, 2006).  Even if the Court were to consider the arguments set forth in her response to King's motion for purposes of

Western's motion, the Court finds it woefully insufficient to withstand summary judgment in the light of the application of punitive damages being very different for claims brought against an employee versus claims brought against an employer. *See, e.g.*, *W. Indus.*, 634 S.E.2d at 120–21 ("[A] plaintiff alleging negligent hiring and/or retention [may] proceed with a punitive damages claim against the employer only when some facts support a conclusion that the employer acted with such 'an entire want of care' as to 'raise a presumption of conscious indifference to the consequences.' A plaintiff can shoulder this burden of proof only be showing that an employer had actual knowledge of numerous and serious violations on its driver's record, or, at the very least, when the employer has flouted a legal duty to check a record showing such violations."). Western is entitled to summary judgment on punitive damages.

## V.   Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** the Consent Motion for Leave to File Matters Under Seal (Dkt. 98) and **GRANTS IN PART** and **DENIES IN PART** King's Motion for Leave to File Matters Under Seal (Dkt. 110).

The Court **DIRECTS** the Clerk to **LIFT** the provisional seal on Dkts. 97; 97-4; 100; 101; 101-2; 101-6; 101-9; 101-10; 101-12; 101-19; 101-20; 101-21; 101-23; 101-24; 101-25; 101-28; 101-29; 109-1; 109-3; 109-4; 109-6; 109-9; 109-10; 109-11; 109-13; and 109-15.

The Court **DIRECTS** the Clerk to **PERMANENTLY SEAL** Dkts. 97-1; 97-2; 97-3; 100-1; 100-2; 100-3; 101-1; 101-3; 101-4; 101-5; 101-7; 101-8; 101-11; 101-13; 101-14; 101-15; 101-16; 101-17; 101-18; 101-22; 101-26; 101-27; 109; 109-2; 109-5; 109-7; 109-8; 109-12; 109-14; 109-16; and 109-17.

The parties are **ORDERED** to file a version of (A) Dkt. 101-11 with only the address listed on page 3 redacted; (B) Dkt. 109-4 with no redactions; (C) Dkt. 109-5 with *only* the redacted language following "the exception of the" on page 1.  In other words, for Dkt. 109-5 no redactions should be on page 1 other than the one listed above, and no redactions should be on page 4.

The Court **DENIES** Plaintiff's Motion to Exclude Expert Testimony (Dkt. 101) as to Drs. Hilton and Cohen and **DENIES AS MOOT** Plaintiff's Motion to Exclude Expert Testimony (Dkt. 101) as to Dr. Burns because Defendants withdrew Dr. Burns (Dkt. 109 at 19).  At this time,

Drs. Hilton and Cohen may testify at trial.  Defendants are **ORDERED** to make Dr. Hilton available for a deposition within thirty (30) days of this Order.

The Court **GRANTS** King's Motion for Partial Summary Judgment (Dkt. 106).  King is entitled to summary judgment on punitive damages.

The Court **GRANTS IN PART** and **DENIES IN PART** Western's Motion for Summary Judgment (Dkt. 108).  Western is entitled to summary judgment on negligent hiring, negligent retention/supervision, and punitive damages.  Western is not entitled to summary judgment on negligent entrustment.

**SO ORDERED** this 23rd day of May, 2022.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE